UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RYAN ROGAN,

     Plaintiff,     Civil Action No. 19-12975

v.             Matthew F. Leitman
             United States District Judge

TIMOTHY TOMLINSON and   David R. Grand
CITY OF ROSEVILLE,     United States Magistrate Judge

      Defendants.
_____/

**ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE THIRD
AMENDED COMPLAINT (ECF No. 47), AND REPORT AND
RECOMMENDATION TO DISMISS PLAINTIFF'S COMPLAINT**

A. **Background**

*Pro se* Plaintiff Ryan Rogan ("Rogan") brings this action pursuant to 42 U.S.C. §

1983 against defendants the City of Roseville ("Roseville") and its City Attorney, Timothy

Tomlinson ("Tomlinson"), (collectively "Defendants").[1]   (ECF Nos. 1, 6, 34).   Rogan's

case arises out of his arrest in August 2015 when Roseville police officers found him in his

car, acting disorderly and in possession of marijuana.   Rogan refused to take certain

sobriety tests, and he then faced a series of administrative and legal proceedings.   In his

second amended complaint, Rogan asserted claims for violation of his rights under the

Eighth and Fourteenth Amendments to the United States Constitution, as well as various

---

[1] An Order of Reference was entered on November 14, 2019, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b).   (ECF No. 13).   Because the Court is recommending dismissal of Rogan's case, it proceeds by way of this Order and Report and Recommendation.

state law claims.  (ECF No. 34).

On December 18, 2020, this Court issued a Report and Recommendation to Grant in Part and Deny in Part Without Prejudice Defendants' Motion to Dismiss and for Summary Judgment (the "R&R").  (ECF No. 42).  In the R&R, the Court recommended that Defendants' motion be denied without prejudice as to Rogan's federal due process claim, the remainder of Rogan's federal claims be dismissed with prejudice, and the Court decline to exercise supplemental jurisdiction over Rogan's state law claims.  (*Id.*).  On March 23, 2021, the Honorable Matthew F. Leitman issued an order adopting the R&R over Rogan's objections.  (ECF No. 46).

On March 30, 2021, Rogan filed the instant motion for leave to file a third amended complaint.  (ECF No. 47).  In his motion, Rogan seeks to add three new defendants – Roseville police officers Mitchell Berlin, Matthew Gerebics, and Scott Burley – and he proposes nine causes of action: (1) breach of fiduciary duties; (2) fraud in the inducement; (3) gross negligence; (4) prosecutorial vindictiveness; (5) prosecutorial misconduct; (6) police misconduct; (7) "Violation of the Constitution (42 U.S.C. 1983)"; (8) civil conspiracy; and (9) intentional infliction of emotional distress.  (*Id.*).  On June 4, 2021, Defendants filed a response to Rogan's motion (ECF No. 50), and on July 10, 2021, Rogan filed a reply (ECF No. 59).  Having reviewed the pleadings and other papers on file, the Court finds that the facts and legal issues are adequately presented in the parties' briefs and on the record, and it declines to order a hearing at this time.

### B. Standard of Review

Fed. R. Civ. P. 15(a)(2), which governs Rogan's motion for leave to amend his

complaint, states that "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  However, courts should deny a motion to amend "if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party or would be futile."  *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995) (citing cases).  "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss."  *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) (citing *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 382-83 (6th Cir. 1993)).

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests a complaint's legal sufficiency.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."  *Twombly*, 550 U.S. at 556.  Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief."  *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

3

In deciding whether a plaintiff has set forth a "plausible" claim, the Court must accept the factual allegations in the complaint as true. *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That tenet, however, "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," to prevent a complaint from being dismissed on grounds that it fails to comport sufficiently with basic pleading requirements. *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555; *Howard v. City of Girard, Ohio*, 346 F. App'x 49, 51 (6th Cir. 2009). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Pleadings filed by *pro se* litigants are entitled to a more liberal reading than would be afforded to formal pleadings drafted by lawyers. *See Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007). Nonetheless, "[t]he leniency granted to pro se [litigants] ... is not boundless[,]" *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004), and "such complaints still must plead facts sufficient to show a redressable legal wrong has been committed[.]" *Baker v. Salvation Army*, No. 09-11424, 2011 WL 1233200, at *3 (E.D. Mich. Mar. 30, 2011).

"In ruling on a motion to dismiss, the Court may consider the complaint as well as … documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims[.]" *O'Dell v. Hope Network West Michigan/Michigan Educ. Corps.*, No. 20-11192, 2021 WL 308116, at *4 (E.D. Mich. Jan. 29, 2021); *see also Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall

within the pleadings for purposes of Rule 12(b)(6).  If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings.").

## C.    Analysis

In their response to Rogan's motion for leave to amend, Defendants argue that the motion should be denied because:

> 1) it is defective on its face, 2) all of [Rogan's] existing and proposed new claims are barred by a release, 3) his newly proposed claims are futile, 4) the proposed amendment seeks to completely transform the nature of his complaint after 1.5 years of litigation, which upends judicial efficiency and significantly prejudices both the existing defendants and proposed new defendants from undue delay, 5) [Rogan] has exhausted the leave permitted by the court upon filing and which was freely given to him in one prior amended complaint and justice does not require that he be given a third opportunity to amend, and 6) the proposed amendment appears to be the product of a bad faith attempt to avoid dismissal of his case by changing its direction and purpose in adding parties and claims.

(ECF No. 50, PageID.705-06).   Having reviewed the parties' submissions, the Court determines that it need not address each of Defendants' arguments in detail because all of Rogan's existing and proposed claims are either (1) barred by the release he executed on October 13, 2017; (2) barred by law holding that he cannot convert what are essentially breach of contract claims into federal constitutional claims; or (3) barred as a matter of law.

### 1.    Factual Background[2]

On August 9, 2015, Rogan was sitting in his car with the engine running, playing music loudly enough that a person had called the police to complain.  A Roseville police

---

[2] While the Court here will focus on the allegations most directly relevant to Rogan's instant motion for leave to amend, a more detailed recitation of the facts was included in the R&R (ECF No. 42, PageID.370-74), which the Court hereby incorporates by reference.

officer approached Rogan's car and asked for his license.  As the officer was writing Rogan a ticket for the loud music, Rogan cranked it up louder.  The officer asked him to step out of the car, and when Rogan did, the officer noticed that he was unsteady on his feet and his breath smelled of intoxicants.  The officer asked Rogan to perform field sobriety tests, but Rogan refused.  The officer also requested that Rogan take a preliminary breath test ("PBT"), but he again refused.  Rogan's refusal to take the PBT constituted a civil infraction.  *See* M.C.L. § 257.625a(2)(d).

Rogan was arrested, and during a search of his vehicle, officers found marijuana. Rogan was taken to the police station where he was asked to take a chemical test, but he refused.  Pursuant to the applicable statute, the arresting officer confiscated Rogan's driver's license, issued him a temporary one, and advised the Secretary of State of Rogan's refusal to take a chemical test.  *See* M.C.L. § 257.625a(6)(b)(v) ("[r]efusing a peace officer's request to take a [chemical test] will result in the suspension of his or her operator's or chauffeur's license and vehicle group designation or operating privilege and in the addition of 6 points to his or her driver record"); MCL § 257.625d ("If a person refuses the request of a peace officer to submit to a chemical test offered under section 625a(6) … [a] written report shall immediately be forwarded to the secretary of state by the peace officer.  The report shall state that the officer had reasonable grounds to believe that the person had [been operating a vehicle while intoxicated], and that the person had refused to submit to the test upon the request of the peace officer and had been advised of the consequences of the refusal.").  Pursuant to M.C.L. § 257.625e, Rogan requested a Driver's License Appeal Hearing before the Secretary of State to challenge the automatic

suspension of his license.  The hearing was held on October 26, 2015, but no police officer appeared for the hearing.  Thus, Rogan was allowed to continue to operate a motor vehicle under the permit that had been issued to him under M.C.L. § 257.625g.[3]

In other words, Rogan was not charged for his refusal to take the chemical test, nor was he charged with any alcohol-related driving offense.  Instead, on March 14, 2016, the People of the City of Roseville filed an action against Rogan in Roseville's 39th District Court, Case No. 15-RV16185, charging him criminally with disorderly conduct and two counts related to his marijuana possession (the "Roseville Case").  (ECF Nos. 40-2, 40-3, 40-4).  Rogan also faced a civil infraction for refusing the PBT.  (ECF No. 40-5).  Also on March 14, 2016, Rogan spoke to someone at the Secretary of State and was advised that his driver's license could not be released "until the City removed the hold[.]"  (ECF No. 39, PageID.315).  It appears, then, that neither Tomlinson, nor any other Roseville employee, took any action that would have caused the Secretary of State to release Rogan's driver's license.  Thus, Rogan's license remained suspended.

Rogan's allegations fast-forward about two years to October 13, 2017, when he was in court for his trial.  (*Id.*).  At that time, Rogan and the Defendants executed a document entitled "Release and Hold Harmless" (the "Release").  (ECF No. 36-2).  Rogan's attorney also signed the Release.  (*Id.*).  The Release provides, in its entirety:

In consideration of the dismissal of all charges[4] in the above matter

---

[3] This did not mean that Rogan's regular driver's license was restored because the statutory framework still gave the arresting officer and local prosecutor an opportunity to file a petition in Circuit Court.  *See* M.C.L. § 257.625f(8).  No such petition was filed as to Rogan, however.

[4] It appears that the civil infraction for Rogan's refusal to take the PBT had been dismissed on May 10, 2016.  (ECF No. 40-5, PageID.359).

[the Roseville Case, 15-RV16185] with prejudice and the forfeiture of funds received by [Roseville] in the arrest of [Rogan],

[Rogan] agrees to release the city, its officers, employees, and agents from any claims, damages, or causes of action of any kind because of the alleged injuries or other damages suffered by [Rogan] that may arise from the incident which gave rise to this case or from the prosecution of this case.

[Rogan and Rogan's attorney] each represent and warrant that they have read the terms and provisions of the release, have conferred regarding the release, and acknowledge that the release is being provided without duress or coercion of any kind being applied against [Rogan].

(ECF No. 36-2, PageID.237) (footnote added).

Rogan asserts that before signing the Release, he asked Tomlinson "for his property back as part of the deal and asked [Tomlinson] if the release of the driver's license hold was part of the release and hold harmless." (ECF No. 47, PageID.536). According to Rogan, "Tomlinson confirmed to release the hold on the driver's license and agreed to release his property as part of the Release and Hold Harmless agreement." (*Id.*, PageID.537). After they signed the Release, Rogan met Tomlinson at the police station to obtain his property. (*Id.*). However, the evidence locker was closed, and Rogan was told to call back on the following Monday to retrieve his property. (*Id.*).

That following Monday, October 16, 2017, Rogan spoke with Lieutenant Berlin, who told Rogan he could not get his property back "due to a forfeiture that was signed." (*Id.*). Rogan further asserts that, a few days later, he went to the Secretary of State and was informed that "there was still a hold on [his] license" by Roseville. (ECF No. 39, PageID.315). Rogan claims that he "continued to check on the status of [his] driver's

license at the Secretary of State in 2017 multiple times, and in 2018 multiple times, and in 2019 and recently in 2020." (*Id.*).

It was not until June 5, 2019, however, that Rogan raised the issue with Roseville, when he went to the Roseville Police Department to request a release of the "hold" on his driver's license. (ECF No. 47, PageID.538). He claims he was told to go to the 39th District Court. (*Id.*). He then went to the 39th District Court and was informed it would take about two days to see the hold released. (*Id.*). On June 7, 2019, Rogan's suspended license expired, as did the temporary license provided to him in October 2015 after his actual license was confiscated. (ECF No. 39, PageID.316). Due to the continuing hold, however, he was unable to renew his license. (*Id.*). On both June 7th and June 8th of 2019, Rogan went to the Secretary of State to verify the release and was informed that the "hold" by the City of Roseville was still in place. (ECF No. 47, PageID.538). On June 19, 2019, Rogan again went to the 39th District Court to request the hold be released and he was directed to go back to the Roseville Police Department. (*Id.*). When he advised that the Police Department had referred him to the 39th District Court, he was told "there was nothing on their end they could do to release the driver's license hold." (ECF No. 39, PageID.316). Rogan then contacted multiple attorneys to help him, but their calls to the Roseville Police Department and the 39th District Court were unsuccessful in getting his driver's license "hold" released. (*Id.*). Eventually, on October 10, 2019, Rogan filed this lawsuit.

In his second amended complaint, Rogan asserted claims under federal law for violations of the Eighth and Fourteenth Amendments (under 42 U.S.C. § 1983), conspiracy

to violate his civil rights (under 42 U.S.C. § 1983), and deprivation of rights under color

of law (under 18 U.S.C. § 242).  (ECF No. 34).  Under Michigan law, Rogan also claimed

breach of fiduciary duties, fraud in the inducement, and gross negligence.  (*Id.*).  In the

R&R, which was adopted in full, the Court recommended allowing Rogan's federal due

process claim to proceed but recommended either dismissing or declining to exercise

supplemental jurisdiction over all of his other claims.

> 2.      *Rogan's Motion for Leave to Amend Regarding Claims Based on Defendants' Conduct up to and Including the Release's Execution Will be Denied*

As set forth above, Rogan signed the Release, which resulted in all criminal charges

against him being dismissed with prejudice, and his forfeiture of the funds Roseville

received in connection with his arrest.  In relevant part, the Release provides:

> [Rogan] agrees to release the city, its officers, employees, and agents
> from any claims, damages, or causes of action of any kind because of
> the alleged injuries or other damages suffered by [Rogan] **that may
> arise from the incident which gave rise to this case** or from the
> prosecution of this case.

(ECF No. 36-2, PageID.237) (emphasis added).   Defendants now argue that Rogan's

motion for leave to amend should be denied because all of the existing and proposed new

claims are barred by the Release.  For the reasons set forth below, the Court agrees, but

only as to Rogan's claims based on conduct up to and including the Release's execution.[5]

However, as explained below, Rogan's claims that were not released are subject to

---

[5] In its prior R&R, the Court declined to rule on Defendants' argument that the Release barred
Rogan's claims because the parties had failed to adequately brief two key questions: (1) whether
the Release arose from the "incident" that gave rise to the case; and (2) whether the Release
satisfied the factors required for enforcing such an agreement.  (ECF No. 42, PageID.380-81).

dismissal on other grounds.

        *a.    Rogan's Claims Based on Conduct up to and Including*
             *the Release's Execution "Arise from" the "Incident"*
             *or the "Prosecution of [the Roseville] Case"*

In his proposed Third Amended Complaint, Rogan asserts a slew of claims, though they fall into two categories: (1) claims based on Defendants' conduct up to and including the Release's execution on October 13, 2017; and (2) claims based on Defendants' conduct that occurred after the Release's execution. As the following chart shows, while some of Rogan's claims fall into only one of these two categories, a few of them relate to alleged conduct both before and after the Release's execution:

| Count | Conduct Occurring Pre- Execution of the Release | Conduct Occurring Post-Execution of the Release |
|---|---|---|
| | | |
| I. Breach of Fiduciary Duty | executing the Release established a "formal relationship"; Tomlinson had "an obligation to present all discovery" and "owed an obligation to [Rogan] to make sure the materials in the [Release] were sustainable"; "improperly filed" search warrant paperwork | "per the [Release] the defendants had an obligation to return the property and funds …" |
| | | |
| II. Fraud in the Inducement | Tomlinson made fraudulent statements to induce Rogan into signing the Release | |
| | | |
| III. Gross Negligence | "prejudicial delay in charging [Rogan]"; "duty to [provide] discovery" | breached "law enforcement duties" by "not upholding the [Release] and not releasing [] Rogan's [] license" |
| | | |
| IV. Prosecutorial Vindictiveness | Tomlinson and Berlin "added two new counts" after Rogan rejected plea offer | "acted with prosecutorial vindictiveness by not releasing the property …" |
| | | |

| Count | Conduct Occurring Pre- Execution of the Release | Conduct Occurring Post- Execution of the Release |
|---|---|---|
| | | |
| V. Prosecutorial Misconduct | Tomlinson improperly charged Rogan, failed to review evidence and provide discovery, and "conspired" with Berlin to "vindictively add charges" after Rogan rejected plea offer | |
| | | |
| VI. Police Misconduct | "the police falsely arrested [Rogan]" and "submitted false affidavits [and testimony] to get warrants" | |
| | | |
| VII. Constitutional Violations | Defendants violated Rogan's "constitutional rights by … prejudicial delay in charging [him] and by withholding discovery," and by conducting an "illegal search and seizure … by not having a reason to arrest [him] due to vague disorderly conduct noise ordinances" | Defendants violated Rogan's "constitutional [due process and Eighth Amendment] rights by not releasing [his] driver's license … [and] not returning property as agreed upon in the [Release]" |
| | | |
| Count VIII. Conspiracy | Defendants "conspired a plan to prosecute [Rogan]"; and "acted in furtherance of their conspiracy by … [p]roviding a false affidavit to secure a warrant"; [f]ailing to be fully truthful … regarding the facts and circumstances leading to the release of the license"; "[f]ailing to investigate the facts and circumstances leading up to the charges …"; "add[ing] charges due to [Rogan] denying a plea deal"; and "prosecut[ing] [] charges … too vague by law" | "Each of the [D]efendants acted in furtherance of their conspiracy by … illegally withholding [] Rogan's driver's license" and "[f]ailing to release the property per the [Release]" |
| | | |
| Count IX. Intentional Infliction of Emotional Distress | all conduct described in complaint alleged to be "extreme and outrageous" | all conduct described in complaint alleged to be "extreme and outrageous" |

The Release's plain language compels a conclusion that it covers all of Rogan's

claims based on Defendants' conduct up to and including the Release's execution on October 13, 2017.  The salient Release language is written in the disjunctive: Rogan agreed to give up any claims he had that "may arise" (1) "from **the incident** which gave rise to this case"; **or** (2) "from the prosecution of this case."   (ECF No. 36-2, PageID.237) (emphasis added).  The reference to "this case" is unquestionably to the Roseville Case, No. 15-RV16185.  Rogan's claims regarding the bringing of the charges (Counts III, V, VII, VIII, IX), various forms of prosecutorial misconduct during the pendency of the case (Counts III, IV, V, VII, VIII, IX), and improperly inducing Rogan's execution of the Release pursuant to which the charges were dismissed (Counts I, II, IX) all clearly "arise ... from the prosecution of [the Roseville] [C]ase."  Thus, all of those claims are covered by the Release.  Determining what constitutes "the incident" that gave rise to the Roseville Case, and therefore which other claims of Rogan's are covered by the Release is more involved.

Again, under the terms of the Release, Rogan agreed to release, in relevant part, "any claims, damages, or causes of action" that "arise from the incident ...." (*Id.*).  Case law gives the phrase "arising out of" a broad meaning.  *See, e.g., Simon v. Pfizer, Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) (describing the phrase "any dispute arising out of an agreement" as "broad"); *Hantz Fin. Servs., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 130 F. Supp. 3d 1089, 1094 (E.D. Mich. 2015) ("Michigan courts interpret 'arising out of' broadly"); *Assurance Co. of Am. v. J.P. Structures, Inc.*, 132 F.3d 32 (table), 1997 WL 764498, at *5 (6th Cir.1997) ("[T]he term 'arising out of' is 'ordinarily understood to mean 'originating from' 'having its origin in,' 'growing out of' or 'flowing from' or in short,

'incident to or having a connection with.'"); *Federal Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 804 (10th Cir. 1998) ("the phrase 'arising out of' should be given a broad reading such as 'originating from' or 'growing out of' or 'flowing from' or 'done in connection with' – that is, it requires some causal connection to the injuries suffered, but does not require proximate cause in the legal sense").  And, where, as here, a term is not defined in a contract, statute, court rule, or other source, Michigan law permits the court to turn to dictionary definitions for guidance.  *See City of Royal Oak v. Southeastern Oakland Cty. Res. Recovery Auth.*, 257 Mich. App. 639, 644 (2003).  Definitions of "incident" include "something dependent upon or subordinate to something else of greater importance" and "[a] dependent, subordinate, or consequential part (of something else)."  *See* https://www.merriam-webster.com/dictionary/incident?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last accessed December 28, 2021); Black's Law Dictionary (11th ed. 2019).  As Defendants persuasively argue: "The essence of these definitions is that an incident is broader than an isolated event.  It is an occurrence or series of occurrences arising from the same origin, closely related to, and resulting from the initial event."  (ECF No. 50, PageID.708).

With those interpretations and definitions in mind, it is clear that in this case, there are several distinct events that built on each other to comprise the "incident" "which gave rise to" the Roseville Case, including: Rogan playing his music loudly enough to attract the attention of the police; Rogan turning his music up even louder after initial contact with the police; the police field investigation that determined Rogan was under the influence;

the police officer offering Rogan a PBT, which he refused; the police officer offering Rogan the opportunity to have his blood alcohol level tested with the use of a breathalyzer, which Rogan also refused; Rogan being arrested for refusing to submit to the PBT; the search of Rogan's vehicle incident to the arrest, which revealed marijuana in a backpack in the backseat of Rogan's car; and the submission of the matter to the prosecutor, which ultimately resulted in the commencement of the Roseville Case.[6]

Therefore, the claims released by Rogan related to the "incident" are broader than just those directly related to the institution of the Roseville Case, and include the following: "improperly filed" search warrant paperwork (Count I, IX); "prejudicial delay in charging [Rogan]" (Counts III, VII, IX); false arrest and use of false affidavits and testimony to secure warrants (Counts VI, VIII, IX); and illegal search and seizure (Count VII, IX).

In sum, the Release covers all of Rogan's existing and proposed claims based on Defendants' conduct up to and including the Release's execution.[7]  All of those claims arose from the "incident which gave rise to [the Roseville] [C]ase" or "the prosecution of

---

[6] Rogan appears to concur with this interpretation of the "incident," as he has asserted: (1) he "had a right to his driver's license after the signing of the contract due to it rose (sic) from the incident as sited (sic) in the release ..." (ECF No. 43, PageID.397); (2) his state law claims should not be dismissed because "they stem from the same incident" (*Id.*, PageID.400); and (3) his refusal to take the chemical test was "part of the incident …."  (*Id.*, PageID.402; *see also id.*, PageID.477 (stating that his "failure to take a chemical breathalyzer test [] was part of the incident that gave rise to case 15-RV16185")).

[7] Any of Rogan's claims based on Defendants' conduct that occurred after the Release's execution would not be released.  In *Cotton v. City of Franklin*, 494 F. App'x 518, 522 (2012), the Sixth Circuit explained, "'[a] general release prevents suits for damages that 'might have been expected to result and were in fact caused' by pre-release actions,' but 'a release 'cannot operate prospectively so as to defeat an action which arises at a time [ ]after' the parties sign the release.'" *Id.* (quoting *Watson Carpet & Floor Covering, Inc. v. Mohawk Ind., Inc.*, 648 F.3d 452, 460 (6th Cir. 2011)).  The Court addresses the post-Release Execution claims below.  *See infra* at 23-27.

[the Roseville Case]."

> b.    *The Release Satisfies the Factors Required for Enforcement*

As this Court recognized in its prior R&R, there is nothing inherently improper about the Release. *See MacBoyle v. City of Parma*, 383 F.3d 456, 459 (6th Cir. 2004) ("The Supreme Court has upheld the validity of release-dismissal agreements whereby a criminal defendant releases his right to file a civil rights action in return for a prosecutor's dismissal of pending criminal charges, as long as the agreement meets certain criteria."). The enforcement of such an agreement is appropriate if (1) it was entered into voluntarily; (2) there is no evidence of prosecutorial misconduct; and (3) the enforcement furthers the public interest. *See Town of Newton v. Rumery*, 480 U.S. 386, 398 (1987); *see also Coughlen v. Coots*, 5 F.3d 970, 974 (6th Cir. 1993). The burden of proof in this analysis "falls upon the party in the § 1983 action who seeks to invoke the agreement as a defense."[8] *Coughlen*, 5 F.3d at 974.

> i.    <u>Rogan Voluntarily Entered into the Release</u>

With respect to the first factor, prior to his instant motion, Rogan had never alleged

---

[8] Although the issue of whether a release bars a plaintiff's claims is an affirmative defense, this does not necessarily preclude dismissal under Rule 12(b)(6) here, where the Court is considering the potential futility of Rogan's claims. *See Valassis Comms., Inc. v. News Corp.*, No. 13-14654, 2014 WL 12585773, at *4 (E.D. Mich. July 16, 20140, *adopted in part and rejected in part on other grounds by Valassis Comms., Inc. v. News Corp.*, 2016 WL 1237660 (E.D. Mich. Mar. 30, 2016). "In an appropriate case, an affirmative defense may be adjudicated on a motion to dismiss for failure to state a claim." *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 16 (1st Cir. 2003). In particular, dismissal on the basis of an affirmative defense is appropriate where "the facts that establish the defense [are] definitively ascertainable from the allegations of the complaint, the documents (if any) incorporated therein, matters of public record, and other matters of which the court may take judicial notice," and "the facts so gleaned ... conclusively establish the affirmative defense." *Id.*

that he did not enter into the Release voluntarily; indeed, his entire case has been premised on Defendants' alleged improper failure *to honor* that agreement.  Rogan alleges that immediately after executing the Release, he and Tomlinson went to the police station to retrieve his property, as he contends was contemplated by the Release.  (ECF No. 47, PageID.537).  And, Rogan has insisted at all times since that the Release was an agreement that the parties entered into and that Defendants breached.  (*Id.* ("Rogan and the defendants [] made an agreement and contract of Release and Hold Harmless . . .  The contract is breached, and [Defendants] have not returned his privileges and property to him . . ."); *id.*, PageID.538 ("[Defendants] entered into [a] formal contract to release plaintiff Ryan Rogan . . . therefore a formal relationship has been established the plaintiff and defendants . . .")).

Rogan's new, self-serving conclusory assertions that he was "coerced" into signing the Release (ECF No. 47, PageID.536; ECF No. 59, PageID.874) are insufficient as a matter of law as they are contradicted by his own evidence, admissions, and conduct.  First, the Release itself provides, "[Rogan and his attorney] each represent and warrant that they have read the terms and provisions of the release, have conferred regarding the release, and acknowledge that the release is being provided ***without duress or coercion of any kind being applied against [Rogan].***"  (ECF No. 36-2, PageID.237) (emphasis added).  Rogan does not contend he did not read the Release before signing it, or that he did not sign it.  Second, Rogan admits that any purported "coercion" was not by Tomlinson or any of the Defendants, but by *Rogan's own attorney*.  (ECF No. 47, PageID.536; ECF No. 59, PageID.874).  Rogan does not contend that the Defendants knew of the alleged dispute between Rogan and his attorney, and any such dispute has no bearing on Defendants' right

to enforce the Release against Rogan.

Rogan's own admissions belie any claim of duress or coercion.  Rogan admits he was not in custody when he signed the Release, and that he was represented by retained counsel who negotiated the Release's terms.  (ECF No. 59, PageID.875).  In fact, by Rogan's own admission, he had months to consider the Release, as he alleges he was first offered the agreement in early March 2017.  (ECF No. 47, PageID.536).  And, in his proposed Third Amended Complaint, Rogan acknowledges the voluntariness (and eagerness) of his signing of the agreement on the day of trial by showing that it was his idea to reconsider it:

> 60.  The Plaintiff asked [his newly retained] lawyer if the deal was still on the table, the new lawyer said he would ask the Prosecutor.
>
> 61.  When the new lawyer returned, he had the plea deal in hand for the Plaintiff to review.

(*Id.*, PageID.536-37).  Thus, by Rogan's own admission, he considered the agreement for two months, refused to sign it, and then fired his attorney.  (*Id.*, PageID.536).  As trial approached with his newly retained counsel, Rogan inquired as to whether the agreement was still available.  Upon learning it was, Rogan signed the Release – some 7½ months after it was initially secured by his first lawyer.  Rogan's new allegation of "coercion" is nothing but a legal conclusion that is owed no deference.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

While Rogan does assert a claim for fraud in the inducement, that claim must be pled with particularity, and Rogan's allegations fail to do so.  Fed. R. Civ. P. 9(b) requires a party asserting a fraud claim to state "with particularity" the circumstances constituting

the fraud. The plaintiff must "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud" or, "the 'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (citations omitted). In Michigan, the elements of a fraud in the inducement claim are: "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 274 Mich. App. 239, 243 (2006).

Here, Rogan merely alleges, "Tim Tomlinson and the City of Roseville made a statement to the plaintiff Ryan Rogan that they would release his driver's license and his property as part of the contract that was entered into by both the defendants and the plaintiff…. The defendants knowingly and willingly were not going to release the plaintiff's driver's license and property at the time of the undersigned [sic]." (ECF No. 47, PageID.540). Such allegations lack the requisite particularity to satisfy the heightened pleading standards that apply to fraud claims. *See, e.g., Safford v. Precision Funding*, No. 09-14925-BC, 2010 WL 548504, at *3 (E.D. Mich. Feb. 9, 2010) ("allegations of fraudulent misrepresentation must be made with sufficient particularity ***and with a sufficient factual basis to support an inference that they were knowingly made***")

19

(emphasis added) (citation omitted); *TSFR Burger, LLC v. Starboard Grp. of Great Lake, LLC*, No. 19-12060, 2019 WL 5597139, at *4 (E.D. Mich. Oct. 30, 2019) (dismissing fraud in the inducement claim that "merely recite[d] the elements of the claim and rel[ied] on conclusions or generalizations.").

Moreover, under Michigan law, "[p]romises regarding the future are considered to be contractual and cannot form the basis of a misrepresentation claim." *Bucciarelli v. Nationwide Mut. Ins. Co.*, 662 F. Supp. 2d 809, 815 (E.D. Mich. 2009) (citing *Hi–Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336 (1976)).  Thus, Tomlinson's alleged statement that he "would release [Rogan's] driver's license and his property" cannot form the basis of Rogan's fraud in the inducement claim.

For all of the above reasons, the first *Rumery* factory – that Rogan entered into the Release voluntarily – is satisfied.

ii.     Rogan Alleges No Facts Supporting
        a Finding of Prosecutorial Misconduct

Under the second prong of the *Rumery* analysis, the Court considers whether "the prosecutor had an independent, legitimate reason to make this [release-dismissal] agreement directly related to his prosecutorial responsibilities."  480 U.S. at 398.  The existence of prosecutorial misconduct or overreach is determined by the court as a matter of law. *See Patterson v. City of Akron, Ohio*, 619 F. App'x 462, 475 (6th Cir. 2015).  "Such a legitimate reason ensures that the prosecutor acts consistent with his duties to uniformly enforce the criminal law, rather than as the agent for the private interests of potential § 1983 defendants." *Id.* (internal quotation marks omitted).  *Rumery* requires that, for a court

20

to find lack of prosecutorial misconduct, the party invoking a release-dismissal agreement as a defense must present evidence of a legitimate criminal justice reason for conditioning the plea agreement on a release.  *See Patterson*, 619 F. App'x at 475.

Here, Rogan alleges no *facts* that would support a finding of prosecutorial misconduct.  Rather, Rogan merely makes conclusory assertions like, "Tomlinson and [] Berlin conspired to vindictively add charges to [Rogan] after he rejected a plea deal in December 2016." (ECF No. 47, PageID.542).  While the Court must accept as true Rogan's well-plead *facts*, his legal conclusions and labels are entitled to no such deference.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Moreover, the evidence supplied by Rogan belies his contentions.

The charges leveled against Rogan in December 2016 are entirely consistent with the facts – *as alleged by Rogan* – from August 9, 2015, and were included in the original group of charges against him.  Indeed, Rogan alleges that the December 2016 charges were "[t]he same charges dismissed in May 2016."  (ECF No. 47, PageID.535).  Rogan also admits that the Release he signed was first proposed by his attorney and the judge – not Tomlinson – in March 2017.  (*Id.*, PageID.536).  Rogan also admits that after initially rejecting that agreement in June 2017, *he* was the one who renewed the effort to sign the Release in October 2017.  (*Id.* ("The Plaintiff asked [his] lawyer if the deal was still on the table, the [] lawyer said he would ask the Prosecutor.")).

In sum, where Rogan alleges no facts from which the Court could find that charges were issued as a bargaining chip to obtain a release, and where Rogan admits that he and his own attorney were the ones who sought the Release, it is appropriate to find no

21

"prosecutorial misconduct" impediment to enforcing the Release. *See Francis v. City of Athens*, 504 F. Supp. 3d 742, 750-51 (S.D. Ohio 2020) (noting that "[the prosecutor] did not even suggest a release—Plaintiff's criminal defense attorney did.").

### iii.   Enforcing the Release Serves the Public Interest

With respect to the final *Rumery* factor, the Sixth Circuit has recognized that whether enforcement of the release-dismissal agreement will adversely affect the relevant public interest is the "least well-defined element of a *Rumery* analysis[.]"  *Coughlen*, 5 F.3d at 975 (citing *Rumery*, 480 U.S. at 398, 401-02).  *Rumery* suggests that this standard can be satisfied if "obtaining the release was motivated by an independent, legitimate criminal justice objective[,]" which "does not appear to create a particularly difficult hurdle for the prosecutor to clear."  *Id.*

Courts have further recognized that a "legitimate criminal justice objective is to achieve as settlement 'where criminal charges are not the product of prosecutorial misconduct and both sides benefit substantially from a balanced settlement in the sense that both avoid exposure to potential liabilities and expenses.'"  *Francis*, 504 F. Supp. 3d at 752 (quoting *Coughlen*, 5 F.3d at 975).  Here, the Court has already explained that Rogan failed to allege sufficient facts to establish prosecutorial misconduct, and Rogan's own admissions establish that he and the defense benefitted from the Release.  As set forth above, after Rogan initially rejected the proposed release agreement in June 2017, *he* was the one who sought to resurrect the Release in October 2017 so that he could avoid a trial. (ECF No. 47, PageID.536 ("The Plaintiff asked [his] lawyer if the deal was still on the table, the [] lawyer said he would ask the Prosecutor.")).  It is undisputed that the charges

22

were dismissed following Rogan's execution of the Release, which necessarily meant there was no trial for either side to attend to. Clearly, then, Rogan received a substantial benefit from the Release, which also benefitted the public interest. *See Francis*, 504 F. Supp. 2d at 752.

In summary, even taking Rogan's well-pled factual allegations into account, all three *Rumery* factors for enforcing the Release are met. Accordingly, the Release is valid, and Rogan's claims based on Defendants' conduct up to and including the Release's execution are barred. *See supra* at 13, 15. Accordingly, Rogan's motion for leave to amend regarding those claims will be denied.

3.   *Rogan's Motion for Leave to Amend Regarding Claims Based on Defendants' Post-Release Execution Conduct Will be Denied*

As noted above, *supra* at 15 n.7, the Release does not bar claims based on Defendants' conduct that occurred after the Release's execution. *Cotton*, 494 F. App'x at 522. Those claims, however, would all be subject to dismissal because, despite their titles, they all (except for one) are state law breach of contract claims[9] that Rogan must litigate

---

[9] The only such claim that is not a breach of contract claim is Rogan's intentional infliction of emotional distress ("IIED") claim (Count IX). But this claim is clearly futile. "To establish a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Hayley v Allstate Ins. Co.*, 262 Mich. App. 571, 577 (2004) (quotation marks and citation omitted). Rogan's IIED claim related to Defendants' conduct after the Release's execution fails for three reasons. First, Rogan fails to plead sufficient *facts* to state an IIED claim. Rather, he merely regurgitates the elements of such a claim, asserting, "Defendants [] by their extreme and outrageous conduct, intentionally and/or recklessly caused Mr. Rogan severe emotional distress as to go beyond all possible bounds of decency and to be regarding as atrocious and utterly intolerable in a civilized community." (ECF No. 47, PageID.548). *See Smith v. Bank of Am., N.A.*, No. 1:11-CV-866, 2012 WL 1657349, at *5 (W.D. Mich. May 10, 2012) (dismissing IIED claim "because it merely states the elements of an IIED claim couched in factual conclusory statements."); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of

in state court.

Returning to the chart of Rogan's claims, the column labeled "Conduct Occurring Post-Execution of the Release" shows that all of Rogan's remaining claims, regardless of their labels, are actually breach of contract claims related to Defendants' alleged failure to satisfy their obligations under the Release.  Count I is labeled "Breach of Fiduciary Duty," but the alleged "breach" was Defendants' failure "to return Rogan's property and funds" as required by the Release.  Count III is labeled "Gross Negligence," but the claim actually asserts that vague "law enforcement duties" were breached by "not upholding the [Release] and not releasing [] Rogan's [] license."   Similarly, while Count IV is labeled "Prosecutorial Vindictiveness," Rogan's actual claim is that Defendants "acted with prosecutorial vindictiveness by not releasing the property …" as required by the Release.

Rogan's two constitutional claims are no different.  In Counts VII and VIII, Rogan asserts that his constitutional rights were violated "by [Defendants] not releasing [his] driver's license … [and] not returning property as agreed upon in the [Release]" and "by

---

action, supported by mere conclusory statements, do not suffice.").  Second, as explained herein, Defendants' alleged post-Release execution conduct all relates to their alleged failure to perform obligations required of them in the Release.  But "Michigan does not recognize a claim for IIED where the conduct complained of relates to duties imposed under an existing contract."  *Jarrett-Cooper v. United Air Lines, Inc.*, No. 11-13674, 2013 WL 6095556, at *6 (E.D. Mich. Nov. 20, 2013) (citing *Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 454 Mich. 65, 83, 559 N.W.2d 647 (1997)); *Vandell v. U.S. Bank N.A.*, No. 14-CV-11933, 2014 WL 6668615, at *2 (E.D. Mich. Nov. 24, 2014) ("the IIED tort is not cognizable in Michigan under a breach of contract action."). Finally, while Rogan has alleged a frustrating experience trying to get the hold on his license released after Defendants agreed to do so, the Defendants' alleged conduct in that regard simply does not, as a matter of law, meet the high threshold of "extreme and outrageous" conduct required to state an IIED claim.  *See Sykes v. Bank of Am. Corp.*, No. 13-CV-12087, 2014 WL 4681608, at *7 (E.D. Mich. Sept. 19, 2014) (compiling cases).  Thus, leave to amend to add an IIED claim will be denied.

… illegally withholding [] Rogan's driver's license" and "[f]ailing to release the property per the [Release]."  Again, the (explicit) gravamen of these claims is Rogan's allegation that Defendants breached the Release.  The law makes clear that, despite their labels, such claims are state law breach of contract claims.

In *Loc. 860 Laborers' Int'l Union of N. Am., v. Neff*, No. 1:20-CV-02714, 2021 WL 2477021, at *9 (N.D. Ohio June 17, 2021), the court held, "[g]enerally, [] 'a claim for a due-process violation does not lie where the thrust of the plaintiffs' argument is simply breach of contract.'"  And, in *Ramsey v. Bd. of Educ. of Whitley Cty., Ky.*, 844 F.2d 1268, 1273 (6th Cir. 1988), the Sixth Circuit explained:

> Supreme Court decisions that state law provides an adequate remedy for a liberty or property deprivation have, to date, all involved deprivations which could be remedied by a state tort action for damages.  However, a state breach of contract action may also provide an adequate remedy for some deprivations of a contractually created property interest.  Therefore, the reasoning of those cases should also bar a section 1983 action when the deprivation is a simple breach of contract and there is adequate state breach of contract action available as a remedy.

> Other federal circuit courts considering this issue have noted that while some contractually created property interests are protected by a cause of action under section 1983, not every interference with a contractually created right does so, for "[i]t is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a state into a federal claim."  [] *San Bernardino Physicians' Services Medical Group, Inc.*, 825 F.2d at 1408; *accord Signet Construction Corp. v. Borg.*, 775 F.2d 486, 492 (2d Cir. 1985); *Sudeikis v. Chicago Transit Authority*, 774 F.2d 766, 770 (7th Cir. 1985); *Brown v. Brienen*, 722 F.2d 360, 364-65 (7th Cir. 1983).

> A state breach of contract action is most clearly an adequate remedy for a property deprivation when the only basis for federal jurisdiction is that a state actor is one of the contracting parties.  Accordingly, a claimed failure to pay for services provided by a construction

contractor against a local school board, as in *Signet*, or a claimed breach of contract due to a unilateral termination of a four-year contract to provide health services to a county medical center, as in *San Bernardino Physicians' Services*, is not only adequately remedied by a state breach of contract action, but far more appropriately remedied by such an action.  This is because ***the state common law of contracts creates the property interest at stake and that same law determines what remedy lies for the deprivation caused by the breach of the contract.***

*Ramsey*, 844 F.2d at 1273 (emphasis added).

While *Loc. 860 Laborers'* and *Ramsey* dealt only with purported due process claims, their reasoning applies equally to Rogan's purported Eighth Amendment claim.   As explained above, Rogan expressly links both of these claims to the Defendants' alleged breach of the Release.   Thus, it was "the state common law of contracts [that] create[d] the property interest at stake," *Ramsey*, 844 F.2d at 1273, and, as courts have held in the Eighth Amendment context, Rogan can remedy those rights in a state court breach of contract claim.   *See Peltier v. Valone*, No. 2:16-CV-10209, 2016 WL 1170800, at *2 (E.D. Mich. Mar. 25, 2016) ("Breach of contract is a state law issue.   'Neither the Eighth Amendment nor any other provision of the United States Constitution provides a basis for a prisoner to recover against prison officials for breach of a contract.'") (quoting *Jordan v. Sheriff Jimmie Brown*, No. 1:16-cv-0001, 2016 WL 128520, *2 (M.D. Tenn. Jan. 12 2016)); *Smoot v. JPay, Inc.*, No. 2:21-CV-1440, 2021 WL 3424732, at *3 (S.D. Ohio May 5, 2021), report and recommendation adopted sub nom. *Smoot v. JPay*, No. 2:21-CV-1440, 2021 WL 2843103 (S.D. Ohio July 8, 2021) ("The remedy for a breach of contract is more appropriately determined in state court – not under § 1983 in federal court."); *Sarauer v. Frank*, No. 04-C-273-C, 2004 WL 2324981, at *14 (W.D. Wis. Oct. 6, 2004) ("Defendant

[] may have breached an agreement by promising plaintiff warm clothes to wear upon release from prison and then failing to follow through on that promise, but a breach of contract is not the same thing as a constitutional violation.  []  If plaintiff so desires, he is free to pursue a breach of contract claim against defendant [] in state court.").

Moreover, to the extent Rogan's Eighth Amendment "excessive fines" claim can be viewed as something other than a state law breach of contract claim, he has failed to properly plead the elements of such a claim.  "A civil forfeiture that is at least partly punitive in nature violates the Excessive Fines Clause 'if it is grossly disproportionate to the gravity of a defendant's offense.'"  *Sisson v. Charter Cty. Of Wayne*, No. 18-13766, 2020 WL 2556792, at *5 (E.D. Mich. May 20, 2020) (quoting *Ross v. Duggan*, 402 F.3d 575, 588-89 (6th Cir. 2004)).   When evaluating whether a forfeiture is grossly disproportional, courts consider four factors: "(1) the amount of the forfeiture and its relationship to the authorized penalty; (2) the nature and extent of the criminal activity; (3) the relationship between the crime charged and other crimes; and (4) the harm caused by the charged crime."  *Id.* (internal quotation marks omitted).  Here, where Rogan asserts only that by "not returning the property and funds as agreed upon and due to the related criminal charges being dismissed previously there is Eighth Amendment violation for excessive fines for a charge that was dismissed and not found guilty of" (ECF No. 47, PageID.545), Rogan has not adequately pled that, under these four factors, any forfeiture was grossly disproportionate.

For all of these reasons, Rogan's motion for leave to amend regarding claims based on Defendants' conduct that occurred after the Release's execution will be denied.

4.    *Report and Recommendation to Dismiss this Action*

In light of the foregoing analysis, Rogan's sole remaining claim is his due process claim that existed at the time he filed the instant motion for leave to amend.  That claim, however, is essentially identical to the one in his proposed Third Amended Complaint discussed herein (compare ECF No. 34, PageID.184 (alleging Defendants violated the Constitution "by not releasing the plaintiff's driver's license and returning property as agreed upon in the contract") with ECF No. 47, PageID.544 (alleging Defendants violated the Constitution "by not releasing the plaintiff's driver's license . . . [and] not returning the property as agreed upon in the contract . . .")), and the above analysis applies equally to that claim;  to the extent the claim relates to Defendants' conduct prior to the Release's execution, it is barred by the Release, and to the extent the claim relates to Defendants' post-Release execution conduct, the claim is a state law breach of contract claim that is properly litigated in state court.  *See* 28 U.S.C. § 1367(c) (providing that a court "may decline to exercise supplemental jurisdiction," if it has "dismissed all claims over which it has original jurisdiction"); *Jesse Young v. Prison Health Servs.*, No. 16-CV-13016, 2017 WL 2793956, at *2 (E.D. Mich. June 28, 2017) ("the dismissal of the claims over which the federal court had original jurisdiction creates a presumption in favor of dismissing without prejudice any state-law claims that accompanied it to federal court.") (citing *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002)).

Accordingly, this action should be dismissed, with Rogan's remaining claim based on Defendants' conduct occurring after the Release's execution being dismissed without prejudice so that he may pursue a breach of contract action in state court if he so desires.

**D.     Conclusion**

For the foregoing reasons, **IT IS ORDERED** that Rogan's Motion for Leave to File

Third Amended Complaint **(ECF No. 47)** is **DENIED**.  Further, **IT IS RECOMMENDED**

that this case be **DISMISSED**, with Rogan's remaining claim based on Defendants'

conduct after the Release's execution being **DISMISSED WITHOUT PREJUDICE**.


Dated: December 29, 2021               s/David R. Grand
Ann Arbor, Michigan                    DAVID R. GRAND
                                       United States Magistrate Judge


**<u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>**

The parties to this action may object to and seek review of this Order and Report

and Recommendation, but are required to act within fourteen (14) days of service of a copy

hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file

specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474

U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United*

*States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which

raise some issues, but fail to raise others with specificity, will not preserve all the objections

a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931

F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to

be served upon this magistrate judge.  A party may respond to another party's objections

within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C.

§636(b)(1).  Any such response should be concise, and should address specifically, and in

the same order raised, each issue presented in the objections.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 29, 2021.

s/Eddrey O. Butts_____
EDDREY O. BUTTS
Case Manager